Slosson, J.
The questions involved in this case principally arise, upon the construction to be given to the trust deed of October the 31st, 1849. If its provisions are free from ambiguity, it will be unnecessary to look beyond it.
The general purpose of the deed is, to provide a fund for the payment of the annual interest, upon the sum, for the consideration of which the contractors had undertaken to construct the extension of the road from Dover Plains to Chatham Four Corners, and to mortgage the extension itself, with its dépóts, buildings, engine-houses, and other improvements and constructions, for the eventual payment of the principal, in July, 1872.
The deed contains no covenant, on the part of the Company, to pay the principal, nor for the payment of the interest, except by a proper application of the fund provided for that purpose.
There is, therefore, no personal obligation on their part, in respect to the payment of the principal; and the only recourse of the certificate-holders, in case of default on the part of the company to pay the principal, when due, is by a foreclosure of the road itself, in the manner prescribed by the deed.
The fund appropriated to the payment of the interest, consists, first, of the “ net earnings” of the business, to be done .on the *330 line of the extension itself; and, second, if that be insufficient, of three-quarters of the “ gross receipts” arising from the business over the old road, from and to stations thereon, to and from stations on the extension, as hereinafter more fully explained.
By the term “ net earnings,” is intended the surplus of the “ receipts from all sources,” as expressed in the fifth article, on the line of the extension, after charging, against such receipts, the actual cost of running or operating the extension, to be ascertained in the manner specially provided for in the deed.
By the expression, “ receipts from all sources on the line” of the extension, we understand the receipts to arise from business to be done exclusively within the termini of the extension itself, and also that proportion of the receipts of the business of transportation from and to stations on the old road, to and from stations on the new, which, by apportionment thereof between the two, according to the number of miles run upon each in such business, would properly be credited to the new road.
Against these receipts, only, are the expenses of operating the extension to be charged, and it is the surplus of such receipts which constitutes the primary fund for the payment of interest.
What such receipts have been heretofore, cannot be determined without a restatement of the accounts by the company.
By the “gross receipts” referred to, in the fifth article,, was intended that proportion of the receipts of the business of transportation, from and to stations on the old road, to and from stations on the new, which, by the apportionment aforesaid, would properly be credited to the old road, and this without any deduction whatever for expenses, and it is to three-fourths of these receipts that the holders of the interest certificates or warrants are, by the terms of the contract, entitled to resort, in case of a deficiency, in the net earnings of the extension, to pay the interest in full.
There is no provision, in express terms, in the contract, for the contingency which has arisen, or is supposed to have arisen, to wit; that of an excess in the expenses of operating the extension, over its “ receipts from all sources," whereby no surplus or net earnings, in fact, exist, which can be applied to the payment of the interest warrants, and this gives rise to the question, which is the principal point of controversy, to wit: whether this excess of expenditure is to be first defrayed out of the gross receipts re *331 ferred to, before any application of the latter to the payment of interest, which is the principle hitherto adopted by the company; or whether the gross receipts are to be applied at once, so far as may be necessary to the payment of the interest, leaving the balance of the expenditures of the extension to be provided for out of other funds of the company. This is the principle contended for by the plaintiffs.
The defendants contend, that the parties to the contract contemplated that the business of the extension proper, and that which it should contribute to the old road, would be always adequate to defray the expenses of operating the extension, and leave some surplus, in any event, for the payment of interest, and that the trust deed was framed on this theory, and common expectation, and that hence it provides only for net earnings of the extension, as the primary fund for the payment of interest, and gives a resort to the gross proceeds referred to, only, in case of a deficiency in such net earnings; that these two sources constitute, in truth, but one common fund for the payment of interest, though to be resorted to in succession, and that, by necessary implication, neither are applicable to interest, until the expenses of the extension are paid, and that hence, in the contingency which has happened—that of a deficiency in the receipts of the business of the extension, as above defined, to meet such expenses—it is to be made good out of the gross proceeds referred to, before the payment thereout of any portion of the interest.
The plaintiffs, on the other hand, contend, that the language of the contract is unambiguous, and that there is no escaping from the express provisions of the fifth section, by which the gross receipts referred to'are, in terms, appropriated to the payment of any deficiency,” in the interest, arising from the insufficiency of the net earnings of extension fully to defray it; and they urge, that, independently of the explicit terms of the contract, there are controlling reasons, some of which will be adverted to hereafter, why the parties must be held to have intended this; and they contend, that in the entire absence of “ net earnings,” the certificate-holders are in the same position, in respect to their right to resort to the gross receipts, that they would have been in, had there been merely a deficiency in net earnings, as expressed in the contract, i
Undoubtedly both parties contemplated “ net earnings” of the *332 extension, to some extent. ¡Neither of them anticipated an unprofitable or failing business. ¡Neither of them could have contemplated that the business which would be done upon the extension would be inadequate to meet its own expenses, and probably both supposed, that the profits of the business over all its expenses would be adequate, in the general, to pay the entire annual interest of the cost of the extension, and so no express provision was made for a deficiency in receipts to pay expenses.
We think that the trust deed will fairly admit of but one construction. The receipts against which the expenses are to be charged are those only which are specified in the fourth article of the deed, and they are the receipts of the extension “ from all sources” as above explained.
There exists no provision, in the deed, charging these expenses against any other fund. If that proves inadequate to meet the expenses, all that can be said is, that it is a contingency not provided against in the deed.
It is no answer, to say that the parties never contemplated such an event; doubtless they never did, but that does not help the defendants. It was a contingency which might happen, and might have been guarded against. Had the parties, as the defendants now contend, intended to provide for the payment of the expenses of operating the extension, before any application of receipts to interest, they would naturally have so expressed themselves. The Court can only look to the language of the contract; and we must, if it be unambiguous, be confined to it, in determining what the parties intended. We find, in it, an express provision for charging the expenses in question against a certain fond, and no provision for charging them against any other, and we find an equally express provision for the payment 'of interest, out of any surplus of that fund, and out of a certain other fund, without deduction for expenses, if the first fund should prove inadequate.
The first provision was intended for the indemnity of the company, in respect to expenses; the second, for the security of the certificate-holders, in respect to their interest. The Court must look to the rights of both parties. It is entirely clear, that however confident the parties may have been, that net earnings would be realized from the business of the extension, the con *333 tractors for the work were not willing to rely upon that, as the only fund to which to look for their interest; the hazards of the future were, to some extent, taken into consideration.
The extent of net earnings, or the existence»of net earnings at all, would depend upon the amount of the expenses of the extension. It could not certainly be known, what these expenses would amount to; it was still more uncertain, what would be the increase of business arising from the extension of the road.
In this uncertainty, as security for the payment of the interest was one of the primary objects of the deed, the provision for the application of the gross proceeds in question, to cover the case of a deficiency in the net earnings of the extension, was the most natural one that could be adopted. It furnished a security which was reasonably reliable. These interest warrants were to be made negotiable, and, to give them negotiable value, it was necessary that the provision for their payment should be such as could be safely depended on; and this was especially important, in view of the fact, that the company was not personally responsible for the payment.
Now, all these objects are secured, by the provision in respect to the gross receipts, if the expression, “gross receipts,” is to be understood in its ordinary popular signification, to wit: receipts without deductions for charges or expenses; but if these receipts are, equally with the receipts from the business of the extension, to be charged with the expenses of operating the extension, the whole security for interest is again rendered uncertain and doubtful, since it cannot certainly be said, in respect to the business of any one year, that the expenses, of operating the extension, may not absorb the entire receipts, both of the extension, and of that part of the old road, embraced in this provision, in respect to the gross receipts.
We think the parties intended precisely what they have expressed in this instrument. By “ net earnings” and “ gross receipts,” they intended what those expressions in popular meaning signify, and nothing other or different; the whole spirit of the contract, the objects to be secured and the language of the deed, all import it, and render this construction necessary. Upon this construction, and on no other, can the distinction made between “ net earnings” from one source, and “ gross receipts” from the *334 other, be explained, and why the contract did not, in terms, provide that the two should constitute a common fund, against which the expenses in question should be charged. It was not so done, '• because such was not the intention of the parties.
But it is said, that the parties have themselves, practically, given a different construction to these stipulations, and have, by their acts, adopted that now contended for by the company.
These acts consist, in the rendering, by the company, to the trustees, or submitting to their inspection, for a period of some three years, before the filing of the complaint in this case, annual accounts of the receipts and expenses of the extension, made upon the principle for which the defendants now contend, and the payment of interest, and the issuing of deferred warrants (or warrants for unpaid interest, as provided form the sixth article of the deed of trust) to the holders of the certificates, upon the principle adopted in said accounts; and it is now contended, on the part of the defendants, that the Court is bound to adopt the construction thus practically given, to the contract, by the parties themselves.
It is undoubtedly true, that, where the provisions of an instrument are ambiguous, the Court may look to the acts of the parties done under it, “ as a clue” to their intention. (Chapman v. Bluck, 4 Bing. N. C. 187; Doe ex den Pearson v. Ries, 8 Bing. R. 180.)
The principle itself is intelligible enough, but I think it admits of great doubt, whether it can be properly applied" to a case like the present—that of a contract strictly executory, covering a period of a long number of years, during each of which accounts are to be rendered of receipts and expenses, and payments to be made semi-annually, and, in respect to which, the only ambiguity which exists, if any, is as to the principle upon which the accounts shall be made up.
In respect to the holders of the certificates, moreover, it may be said, that though they have accepted deferred warrants for a portion of their interest, it by no means follows, that they understood that the accounts were made up on a principle different from that which was sanctioned by the deed of trust. There is no evidence, that they ever saw the accounts; and though it is admitted in the case, that “ the accounts, reports and statements set *335 forth in the complaint and answer (which undoubtedly did show the principle adopted by the company) were accessible, and open at all times to be inspected by any party interested therein, and that the defendants settled, from time to time, with the certificate-holders, on the basis and terms therein stated,” it does not follow, that, in fact, these accounts were ever examined by them, or that they knew upon what exact principle they were made up.
The company, as is admitted in the case, undoubtedly settled with them, “ upon the basis and terms” stated in the accounts; but I do not understand that admission to refer to any thing more than the action of the company itself.
It is not a question of notice, but of practical conduct, by parties to a contract, with a view to determine its construction, and, to be of any force for such a purpose, such conduct must appear to have been intelligent, and with a full actual knowledge and understanding of all the circumstances. It is true, the complaint admits the rendering of accounts, from time to time, to the plaintiffs; but the plaintiffs are the trustees, and the certificate-holders, would have a right to assume, without themselves inspecting the accounts, that the trustees had seen to it, that the principle of the accounts was in accordance with the provisions of the trust deed. In fine, there is nothing in the case to show, that the certificate-holders, when they received their deferred warrants, knew that they were not issued in strict conformity with the provisions of the sixth article of the trust deed.
The fact, therefore, of their receiving payment, in money, for a part only of the interest, and deferred warrants for the residue, is not to be regarded by the Court as affecting the construction of the instrument in question, or as indicating an understanding, on the part of the contractors, in respect to its meaning and import, other than, or different from, that which the Court itself has assigned to it.
It is a sufficient answer, however, in our judgment, to this whole objection, to say, that the construction of this instrument is not of so doubtful a character, as to render a resort to this extraneous evidence necessary or proper, in order to explain it.
Then, are the plaintiffs, as respects the accounts already rendered, and the certificate-holders, as respects the interest already paid, and deferred warrants heretofore issued, concluded, by their *336 supposed acquiescence in the principle adopted by the company?
It is difficult to say this, unless it can be clearly seen, that the company would be in some way injured, by requiring a resettlement of the past accounts, upon the true principle.
They certainly have not paid more, in any one instance, than they were bound to pay upon the construction of the contract adopted by the Court. They have, in two instances, it is true, paid more, in money, to the certificate-holders, than, upon their own construction of the instrument, they were under obligation to do; but that was not a payment to their own injury, since it was, in fact, less than they were, at the time, bound to pay.' They have not pretended, that by reason, or in consequence, and on the faith of the alleged acquiescence, they have conducted their affairs in any other or different way than they otherwise would have done, or have made payments, or incurred obligations which, but for it, they would not have done.
"We think, therefore, that neither the trustees, nor the certificate-holders, are to be held to have acquiesced in the principle upon which the past interest accounts have been settled, so as to preclude them from now insisting upon their being re-adjusted, and settled in conformity with the true meaning of the contract.
We are all of opinion, that the company have, in respect to the certificates purchased by them, acquired the rights, and stand in the shoes of the original holders. There was no merger. There is no personal liability for the debt, either principal or interest, on the part of the company, and, consequently, no confusion of rights, as debtor and creditor, in the same person, arising from the purchase. And even if there would otherwise be a merger, yet equity will preserve the rights distinct, where the intention, on the part of the person possessing the rights, to preserve such distinction, is either expressly shown, or is to be implied from the benefit to result from so preserving it. (2 Yesey, Rep. 264.)
The agreement of the 7th day of September, 1850, is, unequivocal on this subject, in respect to one million in amount of these certificates, and, in respect to the residue of the certificates so purchased, the purchase was made under resolutions of the board of directors, one of which, in terms, and the other by fair intent indicate the purpose to hold the certificates so acquired, “ with all *337 the rights and privileges belonging to them, as fully and unimpaired, as if held by other parties.”
The judgment at Special Term should be, in all respects, affirmed.
Bosworth, J.—The
first question of importance, raised by the appeals of the Harlem Railroad Company, relates to the true construction of the trust conveyance, dated the 31st of October, 1849.
That question is this. Are the gross receipts, mentioned in the fifth article, to be applied directly to pay interest, and interest only, or are they to be applied, in the first instance, to pay such expenses, of operating the extension, as its receipts may be insufficient to pay ?
The second article requires the company to so keep their accounts, as to show two results. First, The earnings and receipts of the extension. Second, The receipts of the old road, from the business, from and to stations on the extension, to and from stations on the old road.
For the sake of brevity and clearness, the word “ extension” is herein used to denote the portion of the road to be constructed from Dover Plains to Chatham Four Corners; ■ and the phrase “ old road,” is used to indicate the residue of the road which had been completed, and was in operation before the trust conveyance was executed.
The third article, among other things, prescribes the mode of ascertaining the expenses of running the extension.
The fourth article provides, and declares, that the extension shall be credited “ with the whole receipts, from all sources, on the line thereof,” and that it shall be charged with “the actual cost of the number of miles run thereon, by freight and passenger cars,” and states the mode of ascertaining the amount of such “actual cost.” It then provides that the “residue” of receipts remaining, after paying such “ actual cost,” shall be appropriated “ to or toward the payment of the interest warrants on the said certificates, as the same shall become due and payable. '
By the fifth article, it is agreed, that if the net earnings of the" extension should be inadequate to the payment of the interest warrants, that certain gross receipts, so far as the same might be *338 necessary for the payment of interest, should be applied, to an amount not exceeding three-fourths of such gross receipts.
Pausing here, to ascertain the results contemplated by the parties to the trust conveyance, from the terms of its provisions, it would seem to be clear, that all parties expected the receipts from the extension would exceed the actual cost of operating it. Hence, the fourth article provides for applying the surplus of such receipts, over and above the amount of such cost, to the payment of interest warrants, and makes such surplus the primary fund for their payment, and, if sufficient, the only fund for paying them.
An application of gross receipts, from another source, to the payment of interest warrants, is to be made, under the fifth article, in the event that such surplus, or, in other words, the net earnings of the extension, prove inadequate to the payment of the interest warrants, and in that event only.
If all parties did not contemplate, as a possible result, that the cost of running the extension would be greater than the amount of its earnings, then it was not possible, in any event contemplated by the parties, that the gross receipts, mentioned in the fifth article, should or could be applied to any object, except the payment of interest, eo nomine. For, if the extension had produced net earnings, it would necessarily follow, that the gross receipts could only be applied to satisfy the portion of the interest warrants not paid by such net earnings. By applying the gross receipts to pay that portion of the interest warrants, they would be applied directly to satisfy interest, and interest-only.
In reaching the true construction of the trust conveyance, it is deemed to be of some importance to ascertain, and keep in view, the results anticipated by all parties, as certain, so far as such results are free from reasonable doubt.
What effect, if any, shall be produced on the rights or liabilities of either party, if it shall appear that the actual results are widely different from those contemplated and confidently anticipated by all of them, is a question quite distinct from the meaning of the contract, when construed in the light of the facts exist- * ing, and of the views influencing the parties to it, at the time it was made.
It may be quite true, that neither party to the contract would *339 have entered into it, as it reads, if his clear conviction of the results, from constructing and operating the road, had been such as the experiment has produced.
But that consideration does not aid us, in arriving at the true construction of the contract.
In the report of the company to its stockholders, made in 1850, it is said that, “ By this plan, the business of the road to Dover” (that is the business of the old road) “ remained free from liability for expenses or interest upon debt, the dividends upon the preferred stock incurred no new hazard, and were left upon the ample security now provided in the large and increasing business of the line, and the old stock had a new source of probable profit opened to it, free from all sources of danger to the present resources of dividend.”
Whatever cotemporaneous exposition of the views and anticipations of the railroad company is examined, so far as they are disclosed by the case, the company had no doubt, and exerted itself to convince others, that the earnings of the extension would be more than sufficient to defray the cost of running it.
Having that view unclouded by a doubt, and anticipating profits instead of apprehending an increased expenditure, and anticipating profits so confidently as to be prepared to give the comfortable assurance to the stockholders conveyed by the report made in 1850, the trust conveyance and its terms and provisions, in respect to the point now under consideration, were so drawn as to make a provision, by the fifth article, for the payment of interest which the provisions of the fourth article might be inadequate to satisfy.
The company was to provide cars and motive power, and operate the extension at all events. But the fourth article clearly indicates the view of the company, that the earnings of the extension would more than pay them the cost of running it. If they did not amount to enough to pay such cost, the difference would necessarily be so much loss to the company.
The only persons having an interest in the insertion in the trust conveyance of a further provision for the payment of interest, were the contractors, who were to construct the extension, and receive payment therefor in the two millions of certificates to be issued by the company.
*340 Accordingly, the company, having, by the fourth article, provided a fund for the payment of interest, and a fund, too, which could not exist unless the extension should earn more than it would cost to operate it, but still a fund which the company had not the slightest doubt would arise from the extension alone, and would, therefore, pay some part of the interest warrants, agreed, that if such fund should be inadequate to pay interest in fall, enough of certain gross receipts to pay interest in full, should be so applied.
Hot contemplating the possibility of its costing more to operate the extension than it would earn,' it made no provision in its own favor, by the fifth article, based on such a contingency.
Such a provision as was made, was of importance to the contractors, even if the views, which the company sought to impress on its stockholders, should be generally acceded to. It would create a fund for the payment of interest in addition to that provided by the fourth article, and consequently create more confidence in the certificates, and increase the facility for negotiating them on better terms.
The form of the contract, found in the trust conveyance, strengthens this view of its meaning, and of the intent of the parties to it. If it were not true that the net earnings of the extension, and those earnings alone were designed and understood by the parties to be primarily the sole fund for the payment of interest, and if it had not been anticipated so confidently that 'the extension would earn more than it would cost to operate it, as to make it wholly unnecessary for the company to frame the terms of the contract so as to provide for a contrary result, as a probable one, it is difficult to assign a reason why the contract did not provide that the extension-should be credited, under the fourth article, with the gross receipts, and also with the whole receipts from all sources on the line of the extension," and tiiat it should be charged with the cost of operating it, and that the net earnings, thence arising, should be applied to pay the interest warrants.
The surplus, if any remained after paying the interest in full, would belong to the company, to be expended, as it pleased, for any lawful purpose.
But the whole structure of the contract found in the trust con *341 veyance, and of the trust conveyance itseltj is based on this idea, which pervades all of its provisions.
The extension, when built, was to be represented by the two millions of certificates. The only mode of coercing payment of the principal of the certificates, is by a sale of the extension itself. Whatever dividend the price, at which it might be sold, would pay upon the certificates, to that extent they would be paid, and as to the proportion left unpaid, the certificates would be valueless.
So it was a prominent feature of this scheme or arrangement, that the extension should produce a fund, out of its earnings, for the payment of interest on the certificates semi-annually.
The contract as drawn, prior to reaching its fifth article, makes clear and full provision for ascertaining the amount of the fund to be thus produced, and for the application of such fund to pay interest. Its income, and the source of such income, is stated. The charges by which it may be affected, are enumerated and defined. The surplus anticipated from it, or the fund thence to arise, after deducting the defined charges, is appropriated, and its application directed.
There is.no provision, in any part of the contract, for charging to the extension account any expenses not authorized by the fourth article to be charged to it. Nor is there any provision for crediting it with income from any source other than the earnings of the extension.
But having defined clearly, and so clearly as to be exempt from obscurity, what shall be credited, and what shall be charged to the extension account, and contemplating that it cannot fail to produce a surplus, the fourth article makes that surplus a fund for the payment of interest.
The contractors, for their better security, and to have some resort for the payment of interest, if the fund provided for the purpose should be inadequate to pay it in full, obtained a further agreement, in the fifth article, that if that fund should not be large enough to pay interest in full, that other revenues, not exceeding" three-fourths of their amount, to such extent as they may be “ necessary for the payment of interest,” should be so applied.
I say so applied, because in drawing this fifth article, there was nothing to be provided for, having reference to the preceding articles of the contract, except that part of the interest, which the *342 fund created by the fourth article might be insufficient to pay. Uothing was reasonably possible, according to the views of the parties, except that some interest might be left unpaid, after that fund had been applied.
Hence, as I think, a view of the whole contract, as well as the natural and obvious import of the language employed in it, leads to the conclusion, that the application of the gross receipts contemplated, intended and provided for by the fifth article, was an application directly to the payment of interest, and to the payment of interest only.
The provisions of the sixth, eighth and ninth articles, like those of the fifth, are mainly, if not exclusively, for the benefit of the contractors, and those to whom they might transfer the certificates.
It is difficult to find, in any provision subsequent to the fourth article, any clause, apparently designed or adapted to relieve the company from the expenses or consequences of any acts which it had contracted to do by the fourth article, and the articles preceding it.
The sixth article declares what the holders may require, and what the company must do, if the whole fund, provided by the fourth and fifth articles for the payment of interest, shall be insufficient in any one year for that purpose, and how and when such deficiency shall be paid.
By the seventh article, when a year is reached, in which all interest accruing that year, and the deficiency of former years, shall have been paid in full, although a surplus of moneys applicable to that object shall remain, the accounts up to and for such year shall be closed, and such surplus cannot be resorted to, to pay any deficiency of interest subsequently arising.
The eighth article confers the right on the certificate-holders, in case the interest shall at any time be in arrear for two whole years, to have the extension sold and require the company to surrender possession of it to the purchaser.
But by the ninth article the company may be required, by such purchaser, to operate the extension on precisely the same terms that they have covenanted to operate it, for the benefit of the certificate-holders, before such a purchase shall be made.
The eleventh article is as stringent as the eighth and ninth, in *343 the event of a sale of the extension after the time fixed for the payment of the principal of the certificate.
By the ninth and eleventh articles, the purchasers of the extension, for whichever of the two causes named a sale may be made, may run the extension as their own property, and on their own account, or compel the company to do it, on the terms mentioned from the second to the sixth articles inclusive.
If it be asked, if the company must be compelled to operate the extension on such terms, ánd apply its revenues Rom the old road to pay the cost of operating the extension; and even though they might not be sufficient for that purpose, the answer is, if by the clear meaning of their contract they have agreed to do so, they must perform it, or submit to such consequences as result Rom breaking a valid contract.
If it be said, that such a consequence may involve them in ruin, the answer is, if any be required, that it was their misfortune to make so unwise a contract, and though bankruptcy should be the consequence, it is a result which happens to individuals under like circumstances, and one which corporations cannot escape any more than natural persons.
If the construction given to this contract is clearly correct, then the company has no ground for claiming, that it has been induced to do acts to their prejudice by reason of the settlements of interest made, which should conclude the trustees and certificate-holders, Rom claiming the benefit of the contract as now construed.
Upon the construction here given, the company should have paid money, instead of issuing deferred warrants. They had money in hand sufficient to pay interest in full, which it was their duty to have paid, and the right of the certificate-holders to demand.
They have done nothing, therefore, to affect themselves prejudicially, as between themselves and the certificate-holders.
That the stockholders may have received some of the money which should have been paid to the certificate-holders, or that the company may have used it to buy cars, or erect dépóts, or pay the expense of other improvements, is no reason why they should not pay the certificate-holders that which was, at the time *344 of all of these settlements, then due, and at none of which they were paid all that was truly due.
If I regarded the true meaning of the contract so ambiguous or doubtful, that the construction claimed by the company was as well supported, by a just and fair view of all the provisions of the contract, as that now claimed by the certificate-holders, I should feel at liberty—if it appeared that the parties to it had, year after year for several years, with a full understanding of all the facts, practically given it one construction, by settling in conformity to it—to hold, that it meant what the parties, by such acts, had demonstrated that they understood it to mean.
Especially would it seem to be reasonable, when the parties, claiming a construction adverse to the one they had given to it in practice, had from time to time, as such settlement occurred, relinquished claims as important as they would have done in this case, and thereby without a cause, unless the practical construction was the true one, have so far depreciated their certificates as to make them unmarketable, when the new construction claimed, if the true one, and according with the real intent and understanding of the parties at the time of the contract, would have made the certificates command a premium in the market.
- But I regard the true meaning of this contract to be free from reasonable doubt.
Neither the facts found, nor the evidence given, warrant the conclusion, that any such practical construction has been deliberately and understandingly given, to the contract in question, as the company claims to be the true one, by the original parties to it, or by the certificate-holders, with a full knowledge of the details resulting from operating the extension.
In Cary v. The Harlem Railroad Company, the Court states, that “ It was not shown that any of these accounts and statements were delivered to the trustees, or shown to the certificate-holders prior to September 26th, 1853.” It'is not stated when, thereafter, they were shown to either of them.
The Court adds, it was given in evidence, “ That on the 25th day of September, 1855, the said defendants, Knapp, Ketchum and Holley, as trustees, were notified that the said accounts and documents were ready for their inspection, and that the plaintiff was so notified on the 26th of said September.” That action was *345 commenced on the 26th of September, 1855. In the case of Knapp and others v. The Harlem, Railroad Company, the case, in this respect, is no stronger, on the part of the defendants.
The opening of the extension took place on the first of April, 1852.
The full interest due on the 1st of July, 1852, was paid in cash.
No interest was paid on the 1st of January, 1853, it being claimed, that the whole receipts were absorbed by the expenses.
The company, in their answer, allege, and the Court found, that, “ upon the completion of said extension,” they purchased of the said certificates, to the amount of $1,000,000, and subsequently, from time to time, the further amount of $533,500, all of which they now hold.
If the $1,000,000 of certificates were bought by the company, immediately upon the completion of the road, that amount was purchased before any such statement as is required by the third article, had been drawn up, and for aught that is stated in the answer, or found by the Court, the same may be true of the additional $533,500.
It does not appear, that the original contractors held any of the certificates on the 1st of January, 1853, or that there has been any transaction between them and the company since the extension was completed, which would be in any, way affected by either construction of the contract.
It is not found directly, nor proved affirmatively by any witness, that any of the certificate-holders, either about the 1st of January, 1853, or subsequently, before these actions were commenced, actually examined any of the semi-annual statements, made by the company, or the trust conveyance.
It cannot, therefore, justly be said, that the certificate-holders ever (and they were not parties to the contract,) actually examined the semi-annual statements, and accepted part payment of the interest in cash, and deferred warrants for the residue, with distinct knowledge, that the company had applied, or construed the contract, as giving them a right to apply the gross receipts to pay the expenses of running the extension.
That they had an opportunity to examine them, and to obtain a copy of the trust conveyance, and compare them with its provisions, so as to determine for themselves, before receiving the de *346 ferred warrants, whether they had a right to demand cash, may be conceded.
But, so long as it does not appear, that any thing of the kind was done, the most that can be claimed is, that they acquiesced in the results, which the company stated to be the true and actual results, without making any such examination of a long and special trust conveyance, to which they were not parties, as would be required by one who was something more than an ordinary man, and possessing a better than a common understanding, to ascertain their rights, however clear they might seem to be, on bestowing the necessary time and labor to comprehend them.
Even if I deemed the true meaning of the contract more doubtful than I now regard it, it would be difficult to hold, that the owners of the certificates have accepted deferred warrants, with such actual knowledge or examination of the contents of the trust conveyance, and with such examination of the semi-annual statements, as would justify the conclusion or position, that they had, by their acts, given a practical construction to the contract.
I think that no such consequence can be given to the settlements of interest, and the facts proved in relation to them, or connected with them, as should preclude the certificate-holders from insisting upon, and having the benefit of the contract, according to its true construction.
Entertaining these views, and remaining of the opinion, that there is no personal liability resting on the company, for the payment of' the certificates, and that they are, in equity, entitled to the same rights, in respect to the certificates they have purchased, as any other holder of any of the certificates, I think both judgments should be wholly affirmed.
All the Judges, who heard the case of Knapp and others v. The Harlem, Railroad Company, having concurred in the conclusion, that the judgment in that case should be affirmed; it follows that the judgment, in the other action, must also be affirmed.
Woodruff, J.—
When the case of Cary v. The N. Y. & Harlem Railroad Company, et al, was argued, it was understood, that upon all points in controversy, it presented the same questions which had already been discussed at a previous General Term, in the case of Knapp and others v. The N. Y. & Harlem *347 Railroad Company, before Justices Duer, Bosworth & Slosson, and that both cases should be decided, upon consultation, between all the Judges who heard the arguments in either case.
It would therefore suffice for me to say, in addition to what has been said by Mr. Justice Bosworth, who sat with me in this case, that all of the other Justices concur in affirming the judgments, for reasons stated in one or both of the opinions pronounced by him and by Mr. Justice Slosson respectively, and that therefore the judgment in this case must be affirmed.
I feel nevertheless reluctant to affirm a construction of the contract made by the defendants, the Harlem Railroad Company, to which I think they never have, in fact, intelligently assented, and to which they were never supposed to have assented by those with whom they contracted—a construction, which, in its practical result, devolves upon the company an onerous burden of expenses, which they would not have agreed to bear, and which those with whom they contracted did not expect them to bear.
If it be insisted that an exigency has arisen, that neither party, at the time of the making of the contracts, supposed to be possible, and against which the company have not perhaps sufficiently guarded and protected themselves, it may be answered, with some plausibility at least, that the minds of the parties have not met and concurred in any arrangement which devolves a heavy and unexpected burden, and a certain heavy loss upon the company. And again, if it be conceded that an exigency has arisen which neither of the parties contemplated, is it not a just and safe rule to govern the construction of their contract, in such an exigency, to follow the plain design, intent and spirit of the agreements, if that can be clearly ascertained ?
It is true, that if the words of the contract are entirely plain, and are susceptible of only one construction, there is an end of discussion, and we have no inquiry to make after the intention of the parties. In such case, the agreement speaks the intention, and conclusively proves, that the parties meant what they expressed, andthat in the intention, so expressed, the minds of the parties did meet and concur.
There is strong evidence in the whole structure of the agreements, and set forth in the deed of trust, embracing the whole arrangement for the construction of what is called “ the extension,” *348 from Dover Plains to Chatham Four Corners, that the company and the contractors both intended that such extension, if made, should be made without expense or cost to the then stockholders, and without any hazard to them that the income, derivable from the old'road, in its then condition, should be reduced thereby.
The inducement to such extension was, however, the hope that the business done thereon, together with the business thereby brought to the old road, would not only pay the cost of such extension and the interest thereon, but yield an additional income for the benefit of the stockholders.
The same evidence makes it probable, that those who contracted to build the extension assumed the risk of obtaining ultimate payment from the proceeds of the business so done,, and that the price, or consideration for such building, was fixed in view of that hazard.
It is undoubtedly true, that, if the words of the contract will not admit of an interpretation corresponding with such an understanding in the minds of the parties, the words must control, not-, withstanding, any probable supposition, respecting their intent, inferable from the scheme which they would otherwise seem to have had in view.
But that the scheme of all parties was such as is above intimated, is very distinctly indicated by the character of the arrangement, unless the sections of the deed of trust, which are especially relied upon in the opinions of my brethren, plainly express the contrary.
In order to judge whether those sections must necessarily receive such a construction, let it be, for a moment, assumed that the parties intended that the business done upon the extension, together with the business contributed to the old road by such extension, or by reason of its being built, should alone be applied to the repayment of its cost, and to the interest thereon, and that the old road, or those then interested therein, should not be subjected to any loss by reason of the extension proposed.
Assuming that this was the intention of the parties, what stipulations were necessary to- secure this result? Obviously, first, that the corporation should not be personally or absolutely liable for the cost or the interest thereon.
Second.—That an account should be kept, which should show *349 what were the actual expenses of maintaining and operating the extension, when finished.
Third.—That an account should be kept which should show the receipts from business done exclusively on the extension.
Fourth.—That an account should be kept of all business which could be properly said to be contributed to the old road, by, or in consequence of the building of the extension—which would embrace the carriage of any goods or passengers which came from any place on the extension, (i. e., above Dover Plains,) or which was destined to any such place, and which business, it might reasonably be presumed, would not come to the old road at all, if the extension was not built.
But as this business, so resulting to the old road, from the building of the extension, could not be done without cost, it would be proper to make some allowance for such cost, and so give to the extension all the profit, as justly owing to such building thereof. And, inasmuch as the old road was in actual operation, and the company was actually then incurring the expenses of running the same, it might fairly be assumed, that the carriage "of the last-mentioned goods and passengers would not greatly add to their running expenses; and, therefore, the deduction to be made from the gross receipts, for the cost of this last-named portion of the business, so contributed by the extension, should be small.
Fifth.—The result of the last-named three accounts, to wit: the cost of running the extension, on the one hand, and the receipts for business done on the extension, and the receipts for business so contributed, by the extension, to the old road, on the other hand, would exhibit the whole actual net income, which could arise from the proposed extension of the road, and a fund would be exhibited, which could be appropriated to the cost of the extension, and the interest thereon, without involving the old road, or those interested therein, in any hazard of loss.
And finally, if this fund should not be sufficient to pay the cost of the extension, the holders of the debt, created for its construction, might be allowed to take the extension itself, and run it for their own benefit, or permit the company to run it, accounting for all its earnings, and the profits resulting from its building, according to the plan so provided for. ,
*350 It is plain, that such an arrangement would secure the accomplishment of the intention assumed.
Do the provisions of the trust deed, when examined, appear to conform to the scheme here indicated? or, are they inconsistent with it ?
I. It was held below, and we are all agreed, that the provisions of the contracts are such, that the corporation is not absolutely liable for the cost of the extension, or the interest thereon. If they faithfully account for, and apply the moneys received by them, which are applicable thereto, they are not liable to make up any deficiency. The first point is, therefore, secured.
II. -' The first recital in the trust conveyance, declares an intent to provide the manner in which the certificates issued for the cost of the extension, and the interest thereon, shall be paid; that is to say, from the fund thereinafter provided—i. e., one fund ; and they are to be chargeable thereon.
The condition of the conveyance declares, that it shall cease and be void, if the company shall pay the certificates and interest “ out of the proceeds and earnings of said road, as hereinafter providedthat is to say, out of the fund about to be described, and a fund that is to arise from proceeds and earnings.
III. What, then, is to constitute the fund ? and how is it to be ascertained ?
By the “second” covenant in the trust deed, the company agree so to conduct and arrange their system of business, as to exhibit clearly:—1st. “ The earnings and receipts of that part of the said railroad hereinbefore described,” i. e., the extension. 2d. “ The receipts of the present road, from the business from and to stations on that part of the road herein described, to and from stations on the present road.” Eor what purpose? “In order that the whole income of and from the road herein described may be ascertained.” Here is a definition of the fund upon which the certificates and interest are chargeable, as stated in the recital—and a clear statement of what is meant in the condition, by “ out of the proceeds and earnings of said road.”
The “ whole income of and from the road herein described,” is, therefore, to consist not merely of the earnings and receipts of the extension, i. e., from business done upon the rails thereof; but also of the earnings and receipts of the present road, from *351 business, from and to stations on the extension, to and from stations on the old road, which, it might be assumed, the company would not have received, if the extension had not been made.
It is then, “ third,” provided, that .the account of the current expenses shall be so kept as to ascertain the cost per mile of operating and maintaining the whole road, and “ thereby ascertain the amount chargeable against the income of that part of the road hereinbefore described.” It is clear, that if the income here spoken of is the same as is described in the second article, there is an end of the question. By the second clause, “ the whole income of and from the road herein described” is to be ascertained. The road herein described is the extension “ from Dover Plains to Chatham Four Corners.” That income embraces not merely. what is derived from business done between the termini of the extension, but also the business which, originating or terminating on the extension, is due to its construction and properly belongs to it as income. And when the whole income is so ascertained, then, by the third article, the expenses of maintaining and operating the extension are declared to be chargeable to that income. If, by these clauses, the company have defined the whole fund, out of which the interest on the certificates is to be paid, and have made the expenses chargeable thereto in the first instance, they have accomplished the object in view. They have given up, to the payment of the interest, all the income derivable, actually or constructively, from such extension. And in accordance with this view of the meaning of these clauses, the company have heretofore, for many years continuously, after the extension was completed, kept their accounts and paid over the balance thereof without objection or question.
But it is supposed, that the fourth and fifth covenants in the trust conveyance are inconsistent with an intent to charge the whole expenses of operating and maintaining the extension to the whole income derived in the manner above stated.
It is not difficult to reconcile any seeming discrepancy. If the above view of the meaning of the previous provisions be correct, the company had made the whole income of the extension liable to the payment of the interest on the certificates, as security to the holders thereof, and had made the expenses of the extension chargeable against such income, so that the certificate-holders *352 were assured that they should, to the extent of such interest, have the whole of such income, and the stockholders in the old road would see that what was so appropriated to the cost of the extension was not in diminution of the income already derivable from the old road.
But in assenting to this arrangement the company had secured to themselves a further advantage. It was foreseen, that it might happen that the “whole fund” so provided might not be sufficient in some years to pay the interest, and in other years there might be a surplus; and by the “ seventh” provision it was provided, that when, in any year, that year’s interest should be paid in full, the account of that year should be closed—the surplus, if any, should not be liable for the deficiency of any future year, but might be disposed of as the company saw fit.
And again, it was úndoubtedly anticipated that the receipts on the line of the extension would, alone, be sufficient for the payment of the interest.
There is, therefore, at least, great plausibility in the argument that the fourth and fifth covenants were not intended to change in any manner the application, of any portion of the fund created, from the payment in the first instance to the payment of the expenses of the extension, but only to define how and in what order, in stating the account of the fund, the two branches or portions thereof, already above defined, should be brought into it.
First, (by the “fourth” article,) they should credit to the fund the whole receipts, from all sources on the line thereof, i. e., between its termini, and charge the expenses to be ascertained as above stated. It was doubtless expected, that the balance would pay the interest, and it was to be applied to that purpose. If it should prove sufficient, there would be no occasion to resort to any business done on the old road, although contributed thereto by, or by means of building, the extension. But if it should prove insufficient, then, second, (by the fifth article,) they should apply the second branch of the fund, already defined as forming a part of the whole income of the extension, viz.: three-fourths of the gross receipts from business done over the present road, from and to stations thereon, to and from stations on the extension. (Thus reserving one-quarter, to indemnify the old stockholders for the absolute expenses of doing this last branch of *353 business over the old road.) What is meant by “ apply” as here used ? It is said, with great force, it means apply directly to the deficiency of interest. But, looking back to the second article above referred to, where this identical branch of their revenue is agreed to be stated, in order that the “ whole income” may be ascertained; to the words of condition in the conveyance; and the recital where the certificates are made chargeable upon the whole fund herein provided; and again, to the third article, where the expenses are said to be chargeable against the “ income,” it is not necessary so to construe these words: it much more nearly accords with the apparent design of the parties to say, that it means apply to the fund, i. e., apply to the account stated in the fourth article, thus making the whole income of the extension derived from the two sources applicable, first, to the expenses, and then to the payment of the interest on the certificates.
And this is in harmony with another apparent purpose, applicable to this particular part of the receipts : it was not to enter into the account, any further than might be necessary for the payment of interest; and it is not clear, that it could be claimed at all, for the creation of a surplus.
And once again, that it was to be applied to the fund, as one fund, applicable, first to expenses, and then to interest, is indicated by the fund being always spoken of as single and entire. It is when the “ whole fund,” embracing both classes of receipts, and so made up, is deficient, that, by the sixth article, deferred warrants are to be issued. The application, then, mentioned, in the fifth article, is an application to the account, and made by crediting in the account of the fund, in which are already credited the other class of receipts, (as mentioned in the fourth article,) so much of the receipts of the old road, from the business described, as is necessary to make the balance of that account adequate to the payment of the interest.
The practical result of this view of the contract, is to appropriate to the payment of interest the actual net receipts arising from the building of the extension, and its contribution of business to the old road, and no more. And that this, and nothing more than this, was the precise understanding of the parties, and the declared interpretation, of these clauses of the trust deed, appears, in very terms, in the eleventh article of the covenant, where *354 it is provided, that if the certificates be not paid, the holders may, themselves, require a sale of the extension, or may require the company to operate and maintain the extension, upon the same conditions and provisions for the “ application of the net receipts therein arising,” for a further term of twenty years. It was net receipts, i. e., the balance of the receipts, over and above the expenses, which, the whole scope of the arrangement contemplated, should be secured to the certificate-holders, for the payment of interest.
And this they have received by the manner the receipts have heretofore been accounted for.
Cotemporaneous exposition, of the meaning of the contract, was giv.en by the parties in conformity with these views.
The construction of the contract now claimed, involves the company not only in the loss of the expenses of operating the extension while the certificates are running to maturity, but, as the case may be, during the continuance of the charter of the company, notwithstanding the certificate-holders may cause the extension to be sold, and the company lose all title thereto, since they may still be required to maintain and operate the same for the benefit of the purchasers.
These seem to me strong reasons for rejecting the construction of the contract for which the plaintiff contends, and for believing, that neither the defendants, nor the parties with whom they contracted, ever contemplated any such construction, or agreed to any contract understood to bear such an interpretation.
The conclusions of my brethren, however, on this subject, are controlling; and if I were to confine my attention, solely, to the reading of the fourth and fifth articles, I should be constrained to say, their views were most in accordance with their literal interpretation.
Judgments affirmed with costs.